**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | CASE NO. 1:16 CV 2422 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| Vs. | ) | |
| | ) | |
| $99,500 in U.S. Currency Seized on | ) | |
| March 20, 2016, et al., | ) | |
| | ) | Memorandum of Opinion and Order |
| | ) | |
| Defendants. | ) | |

### INTRODUCTION

This matter is before the Court upon Plaintiff United States of America's Motion to Strike Claim of Samson Primm (Doc. 6). This is a civil forfeiture action against U.S. currency that was seized by law enforcement officials on March 20, 2016; June 17, 2016; and August 18, 2016. For the following reasons, the government's motion is GRANTED.

### BACKGROUND

The government alleges the following facts in its complaint in forfeiture (Doc. 1):

1

**FORFEITURE**

17. In March, 2016, and based upon information obtained since June, 2015, the DEA began investigating Samson Primm for drug trafficking and money laundering offenses.

18. The DEA received information that Primm was scheduled for one-way air travel from Las Vegas, Nevada (LAS), to Cleveland, Ohio (CLE), on March 20, 2016.

19. At approximately 4:50 p.m. on March 20, 2016, at the CLE, a DEA Special Agent observed Primm deplane carrying a black backpack. At approximately 5:09 p.m., Primm retrieved two (2) large black suitcases and proceeded to the valet. Upon delivery of his 2015 Infinity QX80 SUV, an attendant placed both suitcases in the rear cargo area of the vehicle. At approximately 5:45 p.m., Primm departed the CLE.

20. At approximately 6:25 p.m., an officer with the Lorain Police Department (LPD) conducted a traffic stop of Primm's vehicle. The stop - for window tint violation - occurred in the area of East 21st Street and East Avenue, Lorain, Ohio.

21. The officer made contact with the owner/operator of the vehicle, who identified himself as Samson Primm. The officer advised Primm of the reason for the stop.

22. When asked "where he was headed to this evening", Primm stated "a friend's house". However, Primm could not provide an address or street where the "friend" lived.

23. While the officer was checking Primm's window with his tint meter, a second LPD officer - who had arrived on scene as backup - requested that a K-9 officer respond to the scene.

***

25. While a warning citation was being written - and within minutes of the request for assistance - the K-9 officer and his partner "Garp" arrived on scene. Primm was advised that the K-9 officer and "Garp" were going to conduct a drug scent examination of the exterior of his vehicle. Upon being deployed, "Garp" provided a positive alert for the odor of controlled substances.

26. After "Garp" alerted on the vehicle, the two (2) black suitcases, the black backpack, and another backpack were removed from the vehicle. All four (4) bags were placed on the concrete, where "Garp" immediately alerted to a suitcase. A

2

search of the suitcase was conducted and l8 separate stacks of money were located. The stacks of money were held together with rubber bands.

27 . A large amount of currency, in bundles wrapped with rubber bands, is consistent with illegal drug trafficking activity.

28. "Garp" also alerted to the black backpack. A search of the backpack was conducted and a sum of money was located.

*** 

30. The total amount of currency recovered was later determined to be $99,500.00. This $99,500.00 is a defendant property in the instant case.

*** 

32. Following the positive K-9 alerts, Primm had been advised of his Miranda rights. He said he understood those rights.

33. Primm claimed to have won the money while in Las Vegas. An officer asked him "what casino he stayed at while in Las Vegas" and Primm said the Cosmopolitan. The officer then asked Primm if the Cosmopolitan was where he won the money and Primm said yes.

*** 

35. The defendant $99,500.00 was transported to the Lorain Police Department where it was turned back over to DEA personnel.

*** 

38. Between January, 2014, and August,2016, Primm lost approximately $59,555.00 while gambling at the Cosmopolitan of Las Vegas.

Paragraphs 39-48 of the Complaint allege that law enforcement authorities conducted ten trash pulls at Primm's residence. On each occasion, authorities recovered residual quantities of unburnt marijuana. Field tests for the presence of marijuana were conducted with positive results.

49. On June 17, 2016, at approximately 5:00 a.m., law enforcement authorities, including a DEA Special Agent, conducted surveillance of Samson Primm at a

3

location in Parma, Ohio. At approximately 5:35 a.m., Primm exited the location. He placed two (2) suitcases in the rear of his 2015 Infinity QX80 SUV and departed the location. Primm entered onto I-480 at Ridge Road, Parma.

50. Members of the Ohio State Highway Patrol (OSHP) participated in this surveillance/investigation.

51. At approximately 5:49 a.m., an OSHP sergeant observed Primm's vehicle traveling westbound on I-480. The vehicle was traveling at approximately 85 mph.

52. As Primm's vehicle exited onto SR 237, it traveled over the yellow fog line on the left side of the road. A traffic stop was initiated.

53. An OSHP trooper made a passenger side approach on the vehicle. While speaking with the driver and only occupant (later identified as Samson Primm), the trooper detected a faint odor of raw marijuana from inside of the vehicle.

54. The OSHP trooper explained to Primm the reason for the traffic stop. Primm denied speeding.

55. When asked where he was headed, Primm advised he was going to the airport to fly to California to watch the [Cleveland Cavaliers vs. Golden State Warriors NBA Finals Game 7] basketball game.

56. The OSHP trooper explained to Primm that he was a canine handler and that he was going to walk his dog ("Drago") around the vehicle. Upon being deployed, "Drago" provided a positive alert for the odor of controlled substances.

\*\*\*

58. The OSHP sergeant and trooper conducted a search of the vehicle. A glass jar containing suspected marijuana was located in the center console. The trooper took the jar back to Primm and asked him about it. Primm stated that it had to have been left in the vehicle from one of his friends.

59. Later, a field test of the suspected marijuana was conducted with positive results.

60. The OSHP trooper went back and continued the search. A bundle of U.S. currency, with rubber bands around it, was located in a black bag on the back seat wrapped in a cloth. The trooper asked Primm how much money was in the bag. He stated probably about $9,000.00 but he was not really sure.

4

61. The back hatch of the vehicle was opened, and the two (2) suitcases were observed. In one of the suitcases, the OSHP sergeant located bundles of U.S. currency inside of shoes. In the second suitcase, the OSHP trooper initially located "a couple" bundles of U.S. currency inside of pants.

***

64. The vehicle was towed to the Cleveland Highway Patrol Post and the search of
the vehicle was continued.... In total, l7 bundles of U.S. currency were recovered.

65. The amount of currency recovered was later determined to be $107,900.00.... This $107,900.00 is a defendant property in the instant case.

66. A DEA task force officer arrived on scene and took control of the money.

67. Primm was given a receipt for the recovered currency. Also, Primm was issued a minor misdemeanor summons for the possession of marijuana (later dismissed) and a warning for the speeding violation. Primm was released and drove away from the post.

Paragraphs 68-70 of the Complaint allege that law enforcement authorities conducted ten

trash pulls at Primm's residence. On each occasion, authorities recovered residual quantities of

unburnt marijuana. Field tests for the presence of marijuana were conducted with positive

results.

71. On August 18, 2016, law enforcement authorities, including members of the DEA Cleveland Resident Office and members of the Cleveland Heights and Beachwood Police Departments, executed state search warrants at the Huntington Lane, Cleveland Heights, Ohio, residence of Samson Primm.

72. Samson Primm's wallet - containing his Ohio driver's license and other identification cards - was located on the dresser in his bedroom and his 2015 Infinity QX80 SUV was parked in the attached garage. Among other things, officers seized the following items pursuant to the execution of the search warrants: [over ten pounds of marijuana, $57,999 in currency, jewelry, items commonly used in the preparation of drugs for sale, cellular telephones, and methylone.]

**FINANCIAL INFORMATION**

5

74. Samson Primm has not filed Ohio personal income tax returns for the years 2012, 2013, and 2015. On his 2014 Ohio personal income tax return, Primm claimed federal adjusted gross income of $37,410.00.

Paragraphs 75-81 of the Complaint detail purchases that Primm made between January of 2014 and April of 2016 that total well over his reported income.

The government filed its complaint in forfeiture on October 3, 2016, naming the $99,500, $107,900, and $57,999 seized by law enforcement as defendant currencies. The government alleges that the seized currencies are subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6) because they "constitute proceeds from illegal drug trafficking activities, and/or were used or were intended to be used in exchange for illegal controlled substances, and/or were used or were intended to be used to facilitate illegal drug trafficking activities." (Compl. at ¶ 10). Primm, represented by counsel, filed a verified claim to the defendant currencies on November 14, 2016. Primm states that he has an "absolute, and unqualified, interest" in the seized money and that he was in "in exclusive possession of these monies when they were seized." (Doc. 4 at 1-2).

The government now moves to strike Primm's claim for lack of statutory standing under Supplemental Admiralty and Maritime Claim Rule G(5)(a)(i)(B). Primm opposes the government's motion.

**LAW AND ANALYSIS**

The Supplemental Admiralty and Maritime Claims Rules govern judicial forfeiture proceedings. *United States v. Currency $267,961.07*, 916 F.2d 1104, 1107 (6th Cir. 1990). Pursuant to Rule G(5) of the Supplemental Rules, persons claiming an interest in property that is subject to a forfeiture action *in rem* may file a claim contesting the forfeiture. The claim must identify the specific property claimed, identify the claimant and state the claimant's interest in

6

the property, be signed by the claimant under penalty of perjury, and be served on the government. Supp. Admiralty and Maritime Claim R. G(5)(a)(i)(A)-(D).

To contest a governmental forfeiture action, a claimant must have both statutory standing and Article III standing. *U.S. v. $515,060.42 in U.S. Currency*, 152 F.3d 491, 497 (6th Cir. 1998). Statutory standing is established by satisfying the requirements of Rule G(5) for filing a claim. *See id.*; *see also U.S. v. $25,982.28 in U.S. Currency*, 2015 WL 410590, at *2 (N.D. Ohio Jan. 29, 2015). To establish Article III standing, the claimant must have a colorable ownership, possessory, or security interest in at least a portion of the property. *$515,060.42 in U.S. Currency*, 152 F.3d at 497.

Because of the danger of false claims, a claimant cannot satisfy Rule 5(G)(a)(i) with a conclusory statement of ownership. *$25,982.28 in U.S. Currency*, 2015 WL 410590, at *1 (citing *United States v. Thirty-one Thousand Dollars in U.S. Currency*, 2012 WL 5343350, at *4 (E.D. Mich. Oct. 29, 2012) (bald assertion of ownership does not meet the requirements of Rule G(5); *United States v. Nine Thousand Five Hundred Dollars in U.S. Currency,* 2014 WL 7005129, at *2 (N.D. Ohio Dec. 10, 2014) (general statement that claimant is the rightful owner of currency is insufficient to satisfy Rule G(5)) (other citations omitted). Similarly, because of concerns about "straw man" transfers, a claimant cannot demonstrate Article III standing with a claim of "naked possession." *$515,060.42 in U.S. Currency*, 152 F.3d at 498. "When confronted with mere physical possession of property as a basis for standing, [the Sixth Circuit] require[s] some explanation or contextual information regarding the claimant's relationship to the seized property." *Id.* When a claimant uses simple physical possession as a basis for standing, he or she must also allege facts "regarding how the claimant came to possess the property, the nature of

the claimant's relationship to the property, and/or the story behind the claimant's control of the property." *Id.*

At any time before trial, the government may move to strike a claim for failure to comply with Rule G(5) or because the claimant lacks standing. Supp. Admiralty and Maritime Claim RG(8)(c)(i)(A), (B). Here, the government moves to strike Primm's claim to the defendant currencies, arguing that his bald assertions of ownership–that he is the "sole, and absolute owner of the monies, and...was in exclusive possession of these monies when they were seized"–is insufficient to establish statutory standing. In opposition, Primm argues that the seizure of the currency was in violation of the Fourth Amendment and the Takings Clause of the Fifth Amendment. He also argues that he has standing because "a simple claim of ownership, especially if made under oath is absolutely sufficient to satisfy all standing issues." (Doc. 12 at 5).

Primm lacks both statutory standing under Rule G(5) and Article III standing. His claim is nothing more than a naked assertion of ownership. Indeed, he admits as much in his response to the government's motion to strike when he states that "a simple claim of ownership... is absolutely sufficient" to establish standing. His response does not provide any explanation or contextual information regarding his relationship to the seized currencies. Specifically, it does not identify any facts showing how he came to possess the currencies, the nature of his relationship to the currencies, or the story behind his control of the currencies.[1] Similarly, his answer does not shed any light on his claim to ownership. Like his claim and his response to the

---

[1]  Though the government's motion put Primm on notice that his claim is deficient, he does not seek to supplement it.

8

government's motion, the answer merely states that Primm "swear[s], declare[s], indeed assert[s] and affirm[s] these various sums of money are owned, indeed 100% by him. Also, he was in exclusive and sole possession and control of each, and indeed all, of the indicated monies, when it was (or they were) illegally seized from him." (Doc. 7 at 1).

Accordingly, the government's Motion to Strike Claim of Samson Primm (Doc. 6) is hereby GRANTED.[2] Because Primm lacks standing, the Court need not reach his argument that the defendant currencies were unlawfully seized in violation of the Fourth Amendment or the Takings Clause. *See, e.g., United States v. $57,888.00 in Currency*, 2011 WL 2972106, at **2-3 (N.D. Ohio July 11, 2011) (holding that because claimant lacked standing, court need not reach claimant's argument that government did not have probable cause to seize currency).

IT IS SO ORDERED.


 */s/ Patricia A. Gaughan*
PATRICIA A. GAUGHAN
Dated: 1/5/17                          United States District Judge

---

[2]     The government may test a claimant's basis for standing by issuing special interrogatories directed at "the claimant's identity and relationship to the defendant property" pursuant to Supplemental Rule G(6)(a). Primm does not argue that the government should have issued such interrogatories before moving to strike. Moreover, the government should not be put to the burden of propounding special interrogatories in this situation because the claimants' assertions of ownership are too vague to facilitate the drafting of focused interrogatories. *See U.S. v. $104,250.00 in U.S. Currency*, 947 F. Supp. 2d 560, 565-66 (D. Md. 2013) (granting motion to strike before government filed special interrogatories because "[t]here [was] no way, given such vague notions of [the claimant's] connection to the seized currency, that the government could propound focused interrogatories that test the truthfulness of her claim").